15-16-66 United States v. America v. Vinod Patel Moral Argument Clause C-15-5 Motion to Overtake Motion to Second Let's give everybody a chance to clear the courtroom. Okay, you may proceed. May it please the Court, Renee Parity for Appellant Vinod Patel. I'd like to reserve five minutes of my time for rebuttal. Mr. Patel appeals today from his convictions for conspiracy to commit health care fraud and raises two or three issues. First, he challenges one of his convictions based on multiplicity and double jeopardy. And second, he challenges the amount of loss that was calculated in both setting his offense level under the guidelines and for his restitution. And I'm going to take each of these issues in the order that they were briefed. As to multiplicity and double jeopardy, the only real issue for the Court today is whether the Sunodo Totality of Circumstances test applies here. Appellee government makes no real argument that if Sunodo applies, these two conspiracy charges aren't multiplicitous, nor realistically could they. And Appellant does not argue that the charge fails the Blockburger test. So this circuit has repeatedly held that Sunodo applies and has used Sunodo when assessing multiplicity with respect to different conspiracy charges. So why wouldn't it apply in this case? The government says that because there was just one indictment here, rather than two succeeding indictments, that that's the distinction. But they cite nothing other than a single word in Sunodo which they italicized to create this rule. And in fact, multiple cases in this circuit have used the Sunodo Totality of Circumstances case in assessing multiplicity when there was a single indictment. United States v. Mann applied the Sunodo test in finding that two conspiracy charges charged in the same indictment were multiplicitous. In Maxwell v. United States, the United States itself, through the U.S. Attorney's Office for the Eastern District of Kentucky, conceded that two conspiracy charges in a single indictment were multiplicitous under the Sunodo test in the course of an ineffective assistance of counsel case. Multiple cases out of circuit have similarly found United States v. Powell in the Seventh Circuit, United States v. Peacock in the Ninth Circuit, authored by Justice Kennedy when he was chief judge of that court. Two other cases within the circuit have applied Sunodo to indictment, one indictment that charged more than one conspiracy, U.S. v. Vichitvongsa, which I apologize for my pronunciation, and United States v. Lombardo, each of which again used the Sunodo test to assess whether multiple conspiracy charges in a single indictment were multiplicitous. Well, the government suggested we follow the Albornaz case and that it's in conflict with Sunodo. I would suggest that one cannot be because Albornaz was decided before Sunodo. Sunodo is our case and Albornaz is the Supreme Court. Certainly. If they're in conflict, which one do you follow? I would suggest that they're not in conflict, and one of the pieces of evidence that they're not in conflict is that Sunodo was decided after Albornaz, and their certiorari was denied in Sunodo. There are cases in this circuit, United States v. Benton cited in the opposition, that discusses both Sunodo and Albornaz, and in citing Sunodo, it's discussing the factual totality of circumstances case, and in discussing Albornaz, it puts it in the blockburger section of the analysis. That decision was authored by Judge Boggs. If you win this issue, what relief are you seeking, to sit back down and dismiss one of the charges? Exactly, and resentence a defendant. It won't make much difference in the sentence, will it? It won't make much difference if the calculation of loss remains the same. Have you figured it out? Excuse me? Have you figured out what the sentencing guidelines are if one of these gets dismissed? Right. Is there any value to you? The value to the defendant would be, one, that we believe resentencing is appropriate under the question of whether the two sentences given were interrelated. And looking at the Maxwell case, in that case, in assessing whether the sentences were interrelated, the court looked to whether, for instance, the judge had articulated separate sentences, or instead made a statement of the total amount, and then only in the judgment went through and assigned separate amounts. And so here I think that resentencing is appropriate under the standard announced in Maxwell. I think the real relief that a defendant would receive upon remand is that, first, of course, he would have only one conviction on his record, which can have collateral consequences. Two, he would not be subject to a second conviction fine, which, although somewhat small in the grand scheme of things, is still an injury. It doesn't amount to much. It doesn't amount to much, but it is something. And third, we, of course, because we argue that the loss calculation amount was incorrect, if it's remanded for resentencing, the assumption would be that that could be reopened as well and that he might possibly get a lower guidelines range on the sentences as a result. So to continue, sorry, I'm just returning for a moment to the question of Albernaz. Again, I think that Albernaz is best understood as a statutory decision and Sinodo as a fact-determination test, and that there have been multiple cases subsequent to Sinodo that follow Sinodo. It's cross-circuit. Multiple cases have followed this, notwithstanding Albernaz. And as I said, this court has characterized Albernaz as part of the blockworker test rather than part of the factual analysis at issue in Sinodo. Quickly, as to the amount of loss in restitution, I think Appellant's strongest argument here is that there simply wasn't compliance with Rule 32. Appellant's trial counsel did not do the best job highlighting the significant evidence in the record from which it was clear that some portion of these billings were from medically necessary services and thus not computable as loss. But counsel quite clearly made an objection to the amount of loss and specifically to the proof that those billings were fraudulent. Given that objection and that there is some evidence in the record from which a reasonable court could conclude that the amount of loss was not what the PSR had set it at and what the government had set it at, the district court's obligation to make some factual finding under Rule 32 was triggered, which it didn't fulfill. It simply adopted the patient report. Under Lange, doesn't the defendant have to do more than that and just say, well, there's evidence in the record that would show that the loss is not what the PSR says it is and that's it. I mean, there's nothing above and beyond that's offered that would really put the matter at issue in any sort of evidentiary way. Again, it's difficult. I'm not here making an ineffective assistance of trial counsel claim, but I think that the question here is once you have that denial, then the question is, is there evidence in the record that would trigger some kind of obligation for a fact finding? And if the district court had simply said, you say that these billings aren't fraudulent, but you've pointed to no evidence and I conclude that the government's argument is valid and therefore I find that the PSR got it right, I don't think I would have an argument. But that's not what happened here. And the government below was quite clearly relying on an argument that all of the billings were fraudulent because of the kickbacks. What's the connection to the restitution argument where, as I understood it, the court did say, well, you've got one guy over here and you've got somebody over here with 7% of that person and that's it, and so I'm going to stick with the restitution, which is based on essentially the same numbers, isn't it? Yes. The restitution's based on essentially the same numbers. I think the only difference between the restitution issue and the sentencing issue is that we believe that we – I believe, based on my client's interest, that the government has a greater burden of proof here because of the textual dedication in 18 U.S.C. 3664E to – it's the government that bears the burden there. And the Swanson case in the Seventh Circuit and the Vigella case in the Eleventh Circuit, both of which are cited in the briefs, make explicit that in a Medicare or Medicaid case, that the government bears the burden with respect to restitution in that respect. Doesn't it also – I thought your argument would be the government bears the burden under Rule 32 at least once it's put in play. I think that there is that – one could make that argument. I think the argument is stronger with respect to restitution based on the case law. With respect to Rule 32, I think there's many cases that talk about, well, the government has the ultimate burden of persuasion. Defendant has burden of production. In this case, it's sort of almost irrelevant in that all of the evidence that demonstrates that the amount of loss was not what the government said it was is the government's own evidence at trial from its witnesses and its exhibits. Great. Good morning, and may it please the Court. My name is Shane Crawley. I represent the United States. The first question is obviously the double jeopardy, and this Court has already addressed this issue in Fowler earlier this year. Fowler was a co-defendant of Mr. Patel, and in that case, which is cited in our brief, the Court already addressed the issue that it is not multiplicitous and relied on Blockberger. Now, I will admit that I did a poor job of explaining why Blockberger is the appropriate test and not Senito, and that's on me. The answer is because they're different statutes, and that is why the Senito case is not in conflict with Albernaz. Every time this Court has applied Senito, it's been in an instance in which it involved the same statutory offense. Counsel is quite right. It's not simply a successive conspiracy issue, although that's when it's often applied. Senito and cases like that from other circuits are designed to prevent either a mischievous or a confused prosecutor, let's say, from charging someone with the same conspiracy either in the same district or perhaps different districts. That's what that totality of circumstances test is designed to avoid. It's not designed, and it does not apply in a situation where we have congressional intent to make two different agreements, two different conspiracies, illegal. And this Court, as I said, in Fowler, applied Blockberger and found that health care fraud conspiracy under 1349 and the conspiracy to pay or receive kickbacks under 371 are not multiplicitous. That's the same that the Eleventh Circuit found and the Fifth Circuit found, all cited in my brief. Senito had the same statute. I'm sorry, Your Honor? Senito had the same statute. Senito had RICO conspiracy under 1962 C and D. And so there, it was one of the factors under the Senito test is the statute that is charged, but that's more looking at the overt acts that are listed. In a situation in which different statutes are applied, a classic example would be, for example, a conspiracy to distribute narcotics under 846 and then perhaps a money laundering conspiracy under 1956, this Court and every other Court applies the Blockberger test. That's simply because congressional intent makes clear these are two different harms. These are two different agreements, and while one agreement may further the other, as long as there is a different element, there has to be proof of something that the other does not require, then that's the end of the analysis. And as this Court already found in Fowler in a published decision, that's what we have here. 1349, that's health care fraud conspiracy, requires an intent to defraud Medicare. The kickback conspiracy does not require that. It could be for medically necessary services. If I were to bribe a doctor, that would violate that, even though I might need that service. So I would not necessarily have committed the health care fraud conspiracy. Does it further that? Perhaps. But that's why every Court that's addressed this, including this Court, has already ruled on the issue and applied Blockberger. I apologize for not making that more clear. That's why I shouldn't write a brief during the middle of trial. Turning to the other issue, and that will be loss amount, this was a bare denial, and this Court has applied that standard over and over again. All that Mr. Patel did was say the government has not proven that any particular bill was fraudulent. Well, that's not enough to trigger what would be, let's be honest, a very complicated sentencing issue if we were to have to parse through the thousands of medical bills, because recall that each home health care patient was being billed between $4,000 and $4,500. So we're talking $1,000, $1,500, or more. So to parse through those one by one and determine which ones were for medically necessary services and which ones were not, you can't simply say, no, I object, I disagree. The evidence at trial was very clear that this organization was corrupt to the core, that everything was the product of fraud, and yes, Mr. Atul Patel did say that in his years trolling the residents of Flint to try to find someone that had a Medicare card who would be willing to see a doctor, a doctor in someone's home, mind you, for services. He could recall only one. So at best we're talking about $4,500 out of $7.2 million. My math may not be right, but I believe that's .05% of the total loss amount, certainly. Although the cut point is $7 million, so isn't the, you might say, the amount that, at least the first amount that's in play is only about $800,000. If I'm his lawyer, I want to knock down or create enough sand to say, well, I'd just knock it down 10%, Judge. Certainly, if you're his lawyer, you want to get below that threshold. And here we were $1 million over the threshold, $8 million versus $7,000, because the home health care resulted in $7.2 million in loss, and there was an additional $800,000 that came from the pharmaceutical companies with which. Did the judge affirmatively add in that $800,000 because the restitution amount doesn't include all of that, am I right? Actually, what happened was the government objected to the PSR and said that the pharmaceutical amounts should be included. The PSR was amended. So the PSR, at least as I have it in the record, reflected $800,000 loss, or I mean, sorry, $8 million loss. Okay. And so the judge did not have to address that issue because it had already been addressed below, because then coming in Mr. Well, he didn't have to address it because he didn't address it. Well, I. That's the gravamen of her argument. Well, I would agree, and I would argue that it simply wasn't required, and this court has had this sort of situation come up again and again in Medicare cases. Now, recall that this is a post-2011 case, and so the guidelines themselves say in a Medicare fraud case, you start with the aggregate amount of billing. I mean, that's what the guidelines require, and it requires, it puts that duty on the defendant to rebut. That duty doesn't say rebut by denying that it ever happened. It says come in and show us what was legitimate. Mr. Patel did not do that. He did not make any attempt to do that, and to expect a district judge to recall what happened in a trial nine months earlier, and this was, I believe, a seven-day trial, to recall that there was one incident out of over 1,000, that's not the burden. I mean, that's not the standard. The standard is you come in and present some evidence to then put the judge on notice that we need to have a contested sentencing hearing. Mr. Patel did not do that, and that's, frankly, the end of the analysis. And this court has applied that numerous times. I would think that my best case is perhaps the Bainon case. This is in my brief at 554 Fed Appendix 400. It has to come in with some sort of, the defendant has to do something to rebut that loss amount. The same applies with respect to the restitution. The district judge did not err by adopting the same amount from the loss when Mr. Patel did nothing to put him on notice that there would have to be some amount that would be offset. That is his burden. Mr. Patel did not do that. Was there some particular reason that the judge, and again correct me if I'm misstating the record, the judge did talk about the one that was legitimate and the 7% that was legitimate, talked about that in connection with the restitution, but didn't talk about it in connection with the loss? Your Honor, I actually was trying to find that when she mentioned that to opposing counsel. I couldn't find that in the record. I will admit that this was not the most thorough or adequate sentencing, and if we weren't talking about procedural issues here, we might have a different conversation. There is evidence in the record, and I believe that this was certainly in Mr. Patel's brief, perhaps the reply brief, that 7% of one of the individuals, and I believe this was Jeffrey Wade. Jeffrey Wade was a gardener who was a purported home health care patient, although he came to trial and said, I never had home health care services, and he also did receive prescription pills, prescriptions from the Patel pharmacies. I believe the evidence was that perhaps 7% of those were legitimate, and that is where Mr. Patel is now trying to say, well, based on that, we know there were some legitimate things offered. Recall that a fair number of the prescriptions that were filled by the Patel pharmacies were narcotics. These were used for a number of reasons, including to pay off the people that they were bribing, to see the doctors in the first place. And to the extent that they were legitimate, and I believe the reference to Mr. Wade was with respect to thyroid medication, the Patel pharmacies were not even filling this with the generics. They wanted the high dollar amount. They would avoid the generics on purpose in order to jack up the amount they were going to turn around and bill to Medicare. Many of these prescriptions were not even dispensed. They often were kept back and either returned later on to the pharmaceutical companies, or as you may recall, they trucked some of them across the country to New Jersey to sort of black market distribute. So, again, this evidence was not before, this information was not placed before Judge Tarnow, and without that, I don't think there's any duty for him to offset that. The burden was solely on Mr. Patel at the point when the amount was introduced to raise the issue, to raise the issue to the district judge that there needs to be more of a hearing. Mr. Patel did not, and frankly, that's the end of the analysis. That's what this court has held time and time again. Again, this was a complicated fraud scheme. This was a seven-day trial. We're talking about a fraud scheme that was over years, and if we were just to imagine what sort of sentencing hearing we would have to have every time simply a defendant raises his hand and say, well, that's not a right, we're going to have a battle of the experts between doctors here, and perhaps a judge is equipped to do that, but that's not easy. And that's why in many of the cases, in many of the cases that the defendant relies on, we're saying that these things have been, that these amounts have been offset. That's where this court is reviewing the methodology, which is a very different standard. She cites Fowler. She also cites Kolodesh, a case out of the Third Circuit. Those cases did not involve a, did not hold that the court must offset, either in the lost state context or in the restitution context. What those cases did were they were reviewing where the parties had come in and had a methodology, because frankly, in a situation like this, what the government's going to do, they're going to have a paper and multiple boxes full of medical bills to try to explain why some were fraudulent and some weren't. That's assuming at the outset that we even have those bills, and all those underlying records to be able to make that showing. Rather than do that, what often happens is the parties come up with some sort of methodology on how they're going to back out some of those. That did not happen here. Mr. Patel didn't come forward, didn't have that conversation, which frankly, in the Fowler case, that was a co-defendant. That's what this court was reviewing was a predetermined methodology. There were issues there, of course, but that's what they were reviewing. None of that happened. And without that— Did the counsel ask for that to be done? No. Had he, that would have been a very different sort of sentencing hearing. He simply said the government never showed that any of the bills were fraudulent. And, Your Honor, that wasn't required. That was it. So if there are no further questions, I will sit down. Again, I apologize for not doing a better job in my brief for explaining that. Thank you. Thank you. May it please the Court. I'll begin with the issue which counsel raises for the first time here in argument, although he does apologize profusely for it, arguing that Albernaz applies here because it's different statutes. I would argue that, once again, Albernaz doesn't prevent application of the Senito multifactor test to different statute conspiracies. Authority in this circuit indicates that Senito continues to apply to multistatute conspiracies, notwithstanding Albernaz. And, again, I think here understanding Albernaz as being about statutory challenges under Blockberger to the idea of punishing the same type of conspiracy with multiple conspiracy statutes, rather than the fact-intensive analysis that goes on in Senito. And in United States v. Benton, cited in the opposition and, again, authored by Judge Boggs, decided in 1988, in that case the Court used the Senito test to determine whether a Hobbs Act and a drug distribution conspiracy were the same, but concludes they're different under Senito. Then goes on and cites Albernaz in the Blockberger section of the opinion in assessing whether or not the two conspiracy statutes are multiplicitous under Blockberger. United States v. Goff, once again, uses Senito to consider whether a subsequent conspiracy that included an allegation for money laundering was the same as a prior conspiracy to distribute drugs, finds they're separate conspiracies, and, again, that's subsequent to Albernaz. A similar effect, applying Senito to conspiracies charged under different statutes but not finding multiplicity. United States v. Mita, not cited in the briefs 812 F. 3rd 502. In Correll, the United States, 562 Fed Appendix 399, habeas case of the remand for evidentiary hearing on this issue. The Court found it helpful to government that exact same conspiracy statutes were used under Senito. So, again, Senito is treated in Benton and these other cases as a fact-based test that's separate from the statutory test of Blockberger and Albernaz. And I think the dangers that Senito describes about the use of conspiracy statutes to punish in a multiplicitous way can bring it out, can basically create the need for this very fact-specific analysis. With respect to the amount of loss, as the government themselves said, this is not a thorough and adequate sentencing. The government submitted 172 pages of trial evidence with their sentencing memo. This was a case where the Court had overseen, I think, three separate trials. It was a long, huge, ongoing investigation where the Court was on notice of the nature of the conspiracy. I just remembered, with respect to Fowler, the Fowler case doesn't cite Senito. It basically, in a footnote, doesn't cite Senito, doesn't talk about whether or not the two standards are conflicting. It simply applies the Blockberger test, and that's in a footnote. I also believe that opposing counsel mischaracterized the breadth of the evidence below that suggests that there was some non-fraudulent billings. These are summarized in the opening brief. But just to briefly go through them, in addition to the testimony of Jeffrey Wade, that he suffered from sarcoidosis, arthritis, chronic hip pain, and insomnia, and that many of the drugs he received were for those conditions. Although he testified only to a handful of drugs that represented 7 percent, there are other drugs in his schedule that might go beyond that, that are treat conditions that he has. Ramesh Patel testified that only through kickbacks could a profit be made in home health care. And he testified that a profit was only begun in 2009 at First Michigan. At First Michigan, profits doubled that year, if you look at the government's own exhibits about profits there. And so I think that it's mischaracterizing the appellant's argument as to evidence. My time is up. Time has expired. Thank you, counsel, for your arguments. And Ms. Paradis, we want to thank you for taking this case under the Criminal Justice Act. We really appreciate it. I'm sure that, I hope that Mr. Patel sees that this was a real benefit to him. It certainly benefits the system at large. So we thank you. Mr. Qualey, we thank you as well. So the case will be submitted. You may call the next case.